**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK_____**

DAN CHERNER,

          Plaintiff,

    v.

FORVIS MAZARS, LLP, PROFESSIONAL
BANK SERVICES, INC., CHRIS HARGROVE,
MARTY MITCHELL, and KEVIN KANE,

          Defendants.

_____

24 CIV

COMPLAINT

JURY DEMAND

## COMPLAINT

1.    Plaintiff, Dan Cherner, brings this action pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.; and under New York State and Kentucky state law for employment discrimination (New York State Executive Law § 296 and Kentucky Revised Statutes § 344.040), and under New York state and Kentucky state law for breach of contract, fraud, fraud in the inducement, fraudulent misrepresentation, negligent misrepresentation, and other state law claims, pursuant to 28 U.S.C. § 1367.   Mr. Cherner filed a charge of discrimination, in March 2021, with the New York State Division of Human Rights (DHR) which was also cross-filed with the United States Equal Employment Opportunity Commission (EEOC), charging age discrimination and discrimination on the basis of religion/creed.  This filed charge constituted a protected activity.  A dismissal for administrative convenience and a right to sue letter were obtained in this regard.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1367. Plaintiff's state law claims are brought pursuant to 28 U.S.C. § 1367.  Jurisdiction is based on

federal question jurisdiction (28 U.S.C. § 1331), as well as diversity of citizenship, as plaintiff and defendants are citizens of different states (28 U.S.C. § 1332).

3.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2), as, during the time of Mr. Cherner's employment with defendant Professional Bank Services, Inc., he resided and worked in Westchester County, New York, so that a substantial part of the events and/or omissions giving rise to the claims took place in Westchester County, New York.

## PARTIES

4.    Plaintiff Dan Cherner is a citizen of the United States and at all relevant times herein was a resident of the State of New York and Westchester County.

5.    Defendant Forvis Mazars LLP is a Delaware entity.  On September 12, 2022, Forvis LLP announced that Professional Bank Services, Inc. had "joined" Forvis, effective October 1, 2022, through an asset acquisition.[1]  Defendant Forvis is the successor-in-interest to defendant Professional Bank Services, Inc.  Subsequently, Forvis LLP merged with Mazars to become Forvis Mazars, LLP.

6.    Defendant Professional Bank Services Inc. ("ProBank") is a corporation duly formed under the law of the State of Kentucky.

7.    Defendant Christopher Hargrove was the President of ProBank at all relevant times mentioned in this Complaint.  Upon information and belief, defendant Hargrove is a resident of Kentucky.

8.    Defendant Marty Mitchell was an employee of ProBank at all relevant times mentioned in this Complaint.  Upon information and belief, defendant Mitchell is a resident of Kentucky.

---

[1] https://www.forvis.com/news-releases/forvis-expands-financial-services-offerings-addition-probank-austin

9.      Defendant Kevin Kane was an employee of ProBank at all relevant times mentioned in this Complaint.  Upon information and belief, defendant Kane is a resident of Connecticut.

10.      At all times complained of herein, defendants' conduct violated clearly established statutory and common law rights of which a reasonable person would have known.

## STATEMENT OF FACTS

11.      Mr. Cherner is a commissioned bank examiner, having worked at the Federal Deposit Insurance Corporation (FDIC) from 2010 to 2014.  Mr. Cherner, along with his colleagues, helped to save the banking system from potential collapse engendered by the financial crisis that began around 2007-2008.

12.      In or about the end of 2015/beginning of 2016, Mr. Cherner was working as a consultant for a small financial consulting firm, FRC, which was owned by defendant Kane.

13.      Defendant Kane had previously been an employee of ProBank, and, according to information provided by him, still did some work for ProBank in a consulting capacity.

14.      Indeed, ProBank was using and expanded its use of FRC to work on specific engagements in which ProBank needed assistance.  Mr. Cherner's ability to work in many different regulatory areas and accomplish many tasks was of great assistance in obtaining and successfully completing such work.

15.      In 2017, defendant Kane, according to information provided by him, sold all of FRC's customer accounts to ProBank and, upon information and belief, became an employee of ProBank.

16.      When defendant Kane informed Mr. Cherner that he had reached an agreement to sell FRC's accounts to ProBank and to become an employee, defendant Kane informed Mr.

Cherner that he had "arranged" for Mr. Cherner to become a consultant, i.e., independent contractor, to ProBank.

17.     When Mr. Cherner expressed that it would have been appropriate to inform him of ongoing negotiations, so that, for example, he could have potentially been an employee of ProBank and received benefits (such as healthcare, 401(k) plan, etc.), defendant Kane expressed to Mr. Cherner words to the effect that "who the hell do you think you are ?  I don't owe you anything, and you are lucky that I was even able to negotiate to have you used as a consultant."

18.     On September 7, 2017, Mr. Cherner signed a "Consulting Support Affiliate Agreement" with ProBank that was dated September 4, 2017, and countersigned by defendant Mitchell.

19.     Mr. Cherner's work with FRC and in a consultant capacity with ProBank was exemplary.  In 2019, the individual defendants indicated to Mr. Cherner that they wanted him to become an employee of ProBank, and, on or about June 28, 2019, Mr. Cherner signed a written employment agreement with ProBank that was dated June 28, 2019.

20.     The written Employment Agreement provided for a certain payment structure based on billable hours and billable rates; there was no "draw."

21.     The Employment Agreement also provided for a bonus if Mr. Cherner worked (i.e. billed) over 2400 hours per year, based on his employment beginning on July 1, 2019.

22.     The Employment Agreement provided for 1 week paid vacation in 2019, and 2 weeks paid vacation thereafter.  Thus, Mr. Cherner would need to bill, on average, over 48 hours per week to reach the 2400 threshold which would entitle him to a bonus.

23.     During the in-person negotiation of this contract, in or around June 25-26, 2019, defendant Hargrove told Mr. Cherner that he would definitely receive a bonus if he billed over 2400 hours per year.

24.     Defendant Hargrove also confirmed to Mr. Cherner that he would have access to ProBank's marketing resources to engage in marketing to generate more business, and that no one try to thwart him in generating more business or in getting assignments to enable him to bill over 2400 hours per year.  The written contract calls for Mr. Cherner to engage in business development.

25.     Such promises and representations made by defendant Hargrove were material and decisive in Mr. Cherner deciding to accept the offer of employment; they were material representations upon which Mr. Cherner relied and without which he would have not accepted such employment.

26.     From the beginning of Mr. Cherner's employment, defendant Kane acted to limit Mr. Cherner's access to a marketing individual that he had used and convinced ProBank to hire as an employee, even though defendant Kane told Mr. Cherner that he would have unfettered access to this individual to assist in marketing.

27.     Specifically, defendant Kane told Mr. Cherner, on more than one occasion, that he could direct this individual with respect to specific marketing activity and have her engage in specific marketing campaigns.

28.     As Mr. Cherner attempted to engage such individual, and she consistently refused to do any such marketing work for Mr. Cherner, defendant Kane eventually came up with the excuse that this individual "works for ProBank" and she does not have to "take your direction." When Mr. Cherner pointed out to defendant Kane that this was not true and in contradiction to

the representations that defendant Kane had made to him, defendant Kane stated, in effect, "I don't know what else to tell you." This action by defendant Kane was in violation of Mr. Cherner's written contract with defendant ProBank.

29.    Defendant Kane also promised Mr. Cherner a share of marketing leads generated by this individual and from ProBank in general, but these never materialized. In fact, defendant Kane told this individual not to give Mr. Cherner any marketing leads, in violation Mr. Cherner's written contract with defendant ProBank.

30.    ProBank had also hired Mr. Gary Farmer as VP of Marketing & Communications. Mr. Farmer had and has extensive marketing experience in his career. Mr. Cherner started to work with Mr. Farmer to design marketing campaigns in order to obtain more business.

31.    Defendant Mitchell found out about such collaboration and deliberately acted to stop it completely. Defendant Mitchell told Mr. Farmer that he was not to work with Mr. Cherner. This action by defendant Mitchell was in violation of Mr. Cherner's written contract with defendant ProBank.

32.    When asked by Mr. Cherner why he had told Mr. Farmer that he could not work with Mr. Cherner, defendant Mitchell was unable to give any meaningful answer.

33.    Thus, Mr. Cherner had little to no access to individuals employed by defendant ProBank expressly to conduct marketing, in violation of Mr. Cherner's written contract with ProBank and the representations made by defendant Hargrove.

34.    In other words, both defendants Mitchell and Kane showed and engaged in bad behavior in this regard, motivated by greed, jealously, frail ego, deceit, weakness, and avarice. They acted in violation of Mr. Cherner's written contract with defendant ProBank. Their clear

intent was to prevent Mr. Cherner from being able to develop business and ever having enough work to bill more than 2400 hours per year.

35.     Such greed and frail ego and deceit was displayed by defendant Mitchell towards customers and potential customers as well.

36.     Thus, defendant Mitchell lied to a customer's face (the Chief Risk Officer (CRO) of a financial institution) when he was asked by this CRO what the overall cost of a project would be.  Upon information and belief, ProBank and Mitchell caused this institution to be billed some $3-4 million more than the top range of the amount that defendant Mitchell told this CRO that the project would cost.  In other words, defendant ProBank fraudulently overbilled this client at the instigation of defendant Mitchell and tacit approval of defendant Hargrove.

37.     With regard to such engagement, defendant Mitchell intentionally and deliberately used several individuals who were not competent to do such work so he could pay them as little as possible and realize more profit for defendant ProBank and himself.

38.     Mr. Cherner's work on this project was integral to its successful completion.  In addition to many duties that Mr. Cherner had in this regard and many aspects of work performed by Mr. Cherner, for a short period of time, Mr. Cherner conducted Quality Control (QC) reviews of other individual's work on this project.

39.     Mr. Cherner found numerous errors by numerous individuals during his QC review, and reported on such errors and indicated that they needed to be fixed and the source of the errors needed to be remedied.  As a result, defendant Mitchell had Mr. Cherner removed from doing QC reviews, because defendant Mitchell wanted such deficiencies covered up, not corrected.

40.    Further, defendant Mitchell's overbilling of this client and covering up of shoddy work apparently emboldened him to submit wildly overpriced proposals to potential customers that were overpriced by orders of magnitude running into millions of dollars.  When defendant Mitchell overpriced such proposals, ProBank did not obtain such business and in fact lost the ability to turn this potential customer into a customer for any type of work.

41.    Such actions by defendant Mitchell showed and show his lack of substantive knowledge, his lack of understanding of how to price potential engagements, his failure to understand how to write proposals and include appropriate provisions in them, and his failure to understand how to submit properly priced and tailored proposals and to explain them to a potential client so as to obtain that client's business.  Such actions by defendant Mitchell also show his intent to be dishonest and to deceive clients so as to overcharge them.

42.    Despite such wrongful behavior by defendants Mitchell and Kane, Mr. Cherner was able to develop significant business with existing clients and with potential customers. Defendant Kane involved Mr. Cherner on some leads that came in because he knew that he needed Mr. Cherner's expertise and knowledge to potentially turn such potential customer into a customer.

43.    As a result of such activity and resulting exemplary work product and results, Mr. Cherner was busy, such that, in 2020-2021, it was not uncommon for him to have 70-90 billable hours of work per week.

44.    Defendant Kane reviewed Mr. Cherner's hours on a monthly basis.   As Mr. Cherner's billable hours increased in 2020, defendant Kane would state to Mr. Cherner that he was "too old" to be able to work the number of hours daily, weekly, and monthly, that he was

submitting.  Defendant Kane made such statements even though he knew that there was no drop off in the quality and timeliness of Mr. Cherner's work, and that it was exemplary.

45.     Mr. Cherner took great offense to such comments and attitude, and so told defendant Kane, yet defendant Kane continued to make such comments.

46.     Also in 2020, Mr. Cherner informed defendant Kane of his deepening religious beliefs.

47.     In response, defendant Kane ridiculed Mr. Cherner in this regard, and told him that his beliefs in this regard were meaningless.

48.     Mr. Cherner took great offense to such comments and ridicule, and so told defendant Kane; despite this fact, defendant Kane continued to insult and ridicule Mr. Cherner in this regard.

49.     On February 12, 2021, defendant Hargrove reached out to Mr. Cherner, praised him for his hard work and efforts, the quality of his work, his relationships with customers, and so on.

50.     Defendant Hargrove informed Mr. Cherner that he wanted him to attend the next management meeting, scheduled for early March, 2021, and that he, defendant Hargrove, would let all attendees know that Mr. Cherner was going to reach out and speak with them.

51.     Defendant Hargrove so informed Mr. Cherner without any prompting or request from Mr. Cherner; this decision came exclusively and unilaterally from defendant Hargrove without any input from Mr. Cherner.

52.     Defendant Hargrove explained that he wanted Mr. Cherner to speak to various department heads and others to better understand what their departments and areas do, so that he,

Mr. Cherner, might better be able to work with them or bring them in on engagements that he, Mr. Cherner, might be able to get from existing or prospective clients.

53.    Mr. Cherner expressed concern to defendant Hargrove that some of the department heads might not want to speak to him.  Defendant Hargrove told Mr. Cherner that if he told them to speak to him, Mr. Cherner, that they would do so.

54.    Defendant Hargrove explained to Mr. Cherner that he would receive an email notification with a Zoom link to attend this management meeting.

55.    Theoretically, Mr. Cherner's attendance of such management meeting and subsequent follow up represented, potentially, an opportunity to work with more individuals within ProBank, to potentially obtain more business from customers and potential customers and involve other departments and disciplines in such work, and also to work with individuals who were involved in M&A work done by ProBank.

56.    Subsequent to this call, Mr. Cherner received a call from defendant Kane, around the following week, in which defendant Kane interrogated Mr. Cherner and expressed anger and extreme disturbance that defendant Hargrove had reached out to Mr. Cherner and invited him to such management meeting and to reach out to other individuals.

57.    In fact, defendant Kane accused Mr. Cherner of having solicited defendant Hargrove to attend such meeting, even though Mr. Cherner did not even know there were management meetings until the phone call on February 12, 2021.

58.    In fact, defendant Kane harassed and harangued Mr. Cherner, telling him that there were many people in ProBank that had never been invited to a management meeting, and that there are many people who will have ruffled feathers as a result of Mr. Cherner being

invited, and that Mr. Cherner should have thought of that fact, and that he, Mr. Cherner, was inconsiderate and disrespectful in that regard.

59.     Mr. Cherner took great offense to such harassment, and told defendant Kane so, and told him to stop.  Mr. Cherner also explained that defendant Hargrove had invited him to the management meeting and that he, Mr. Cherner, had nothing to do with having been invited.

60.     Defendant Kane refused to stop; rather, he again accused Mr. Cherner of soliciting defendant Hargrove to attend the meeting; Mr. Cherner again told defendant Kane that this simply did not happen.

61.     Defendant Kane accused Mr. Cherner of being rude and disrespectful and told him that it would be rude and disrespectful to attend such meeting.

62.     Mr. Cherner made it clear that such was not the case, and that there was nothing wrong with attending the meeting, and that defendant Hargrove had indicated that he expected him to attend such meeting.

63.     Defendant Kane responded by yelling, "I don't give a fuck what little Chris Hargrove wants" and abruptly ended the conversation.

64.     On March 5, 2021, Mr. Cherner attended the management meeting and was introduced by defendant Hargrove, who let individuals know that Mr. Cherner would be reaching out to them and speaking with them.  The meeting lasted about 90 minutes.  Prior to such management meeting, defendant Mitchell had deliberately delayed in providing Mr. Cherner the link needed to attend such meeting.

65.     Literally within just minutes of the meeting's end, Mr. Cherner received two emails.  The first email was from defendant Mitchell (in which he cc'd defendant Kane), in

which he disingenuously claimed that he had asked Mr. Cherner previously to spend time with

others at ProBank and to "learn about the company", and that Mr. Cherner had failed to do so.

66.     After such mischaracterization, defendant Mitchell ended the email with a rude,

insulting and condescending sentence: "If you think these "interview calls" are a good idea

you'll need to set them up."

67.     In other words, defendant Mitchell lied and tried to portray a situation where he

had already taken steps to have Mr. Cherner speak with department heads, and that Mr. Cherner

had failed to do so. Defendant Mitchell lied to try to discredit Mr. Cherner, and to try to prevent

him from developing working relationships with department heads.

68.     Defendant Mitchell made it clear that he was going to do everything he could to

prevent Mr. Cherner from developing further working relationships with others at ProBank, and

that he was going to continue his inappropriate and illegal efforts to thwart Mr. Cherner's

attempts to be successful, to develop working relationships with more individuals within

ProBank, and to bring more business in to ProBank and to work on more engagements.

69.     Indeed, defendant Mitchell decided to deceitfully and disingenuously try to

portray the situation as one in which Mr. Cherner had been given the opportunity previously to

reach out and develop working relationships with more individuals in ProBank and to bring in

more business and work on more engagements, and that Mr. Cherner had failed to capitalize on

such opportunity.

70.     Such attempts were inappropriate and constituted an intentional and malicious

intent to harass Mr. Cherner and to thwart Mr. Cherner in his employment, all in contravention

of defendant Hargrove's material promises to Mr. Cherner that there would be no such

interference and Mr. Cherner's written contract with ProBank. Such attempts were a

continuation and escalation of the intentional, malicious, and deliberate campaign of harassment and intimidation that defendant Mitchell had engaged in from the very start of Mr. Cherner's employment with ProBank.  Defendant Mitchell knew that his assertions in this regard were lies.

71.    Defendant Kane responded by emailing Mr. Cherner and defendant Mitchell and writing:  "He knows about the company.  This whole thing is bullshit."

72.    In other words, defendant Kane also decided to act disingenuously and deceitfully, to thwart Mr. Cherner from working with other individuals within ProBank, obtaining more assignments, and developing more business, all in contravention of defendant Hargrove's material promises to Mr. Cherner that there would be no such interference.

73.    Defendants Mitchell and Kane continued the harassing, illegal and discriminatory behavior.  Thus, later in the day on March 5, 2021, defendant Kane directed that Mr. Cherner's name could no longer go on contract proposals, and that, if his name was on contract proposals, it had be to be removed.

74.    Prior to this date, Mr. Cherner had regularly written contract proposals with his name appearing on such proposals.

75.    Over the weekend, on March 6, 2021, defendants Mitchell and Kane unilaterally scheduled a conference call with Mr. Cherner for Monday, March 8, 2021, at 10 a.m.

76.    During that call on March 8, 2021, and in a subsequent email, defendants Mitchell and Kane informed Mr. Cherner that: (i) not only could his name no longer appear on contract proposals, but he could no longer write contract proposals; and (ii) his hours were capped at 180 hours for a 4 week billing period and 220 hours for a 5 week billing period (i.e., 45 hours per week).

77.     Prior to this time, Mr. Cherner had been writing contract proposals for years, not only as an employee of ProBank, but also as an independent contractor with ProBank (prior to employment), and, prior to that, as an independent contractor to FRC, a company owned by defendant Kane.

78.     Mr. Cherner's ability to write contract proposals, with appropriate and key language for specific engagements, and to have his name on contract proposals, were essential elements to his ability to obtain engagements, from both existing customers and potential customers.  Defendants knew this to be the case.

79.     Further, there was no cap on anyone's hours at ProBank.  Any attempts to claim otherwise was and is an outright lie.

80.     Meanwhile, Mr. Cherner had calls with 5 individuals, including 3 department heads, on Monday and Tuesday, March 8 and 9, 2021, as directed by defendant Hargrove.  Each of the calls went very well, and each individual explained what the engagements are and the kind of work they do, and expressed the willingness to work with and collaborate with Mr. Cherner on engagements should any such opportunities arise.  Such information and expression was valuable and meaningful.

81.     On Tuesday, March 9, 2021, Mr. Cherner emailed defendant Hargrove, to set up a time to speak, regarding the results of the calls, and to discuss the deceitful, dishonest, illegal, and bad behavior of defendants Mitchell and Kane.

82.     Defendant Hargrove scheduled a call for Thursday, March 11, 2021.

83.     On Thursday, March 11, 2021, Mr. Cherner spoke with defendant Hargrove and told him that the calls had gone well.  Defendant Hargrove responded with an upbeat tone and indicated that he had been informed that the calls went well.

84.    Mr. Cherner then told defendant Hargrove that he wanted to come to Kentucky (where defendant Hargrove and ProBank's HQ were located) and speak with him in person.

85.    Defendant Hargrove stated that he usually goes through department heads in this regard, and that if he was to meet with Mr. Cherner then either defendant Mitchell or defendant Kane would have to be present.

86.    Mr. Cherner told defendant Hargrove that such would not be a good idea, as defendants Mitchell and Kane had been acted badly regarding the management meeting, and that it would be appropriate to meet one-on-one.

87.    Defendant Hargrove asked Mr. Cherner what he meant.  Mr. Cherner proceeded to describe the actions of defendants Mitchell and Kane from March 5, 2021 through March 8, 2021, as described in ¶¶ 64-76 above.

88.    Mr. Cherner told defendant Hargrove that the situation was intolerable, and in contravention of the promises and representations that he had made that induced Mr. Cherner to accept the employment, and the written employment agreement.

89.    Mr. Cherner reminded defendant Hargrove of such promises and representations, and asked if anything was wrong with him, Mr. Cherner, having the view that if he worked hard, was good at what he did, developed his relationships with clients, and did good work with which the clients and regulators were satisfied, that he would be entitled to engage in such work and gain greater financial remuneration.

90.    Defendant Hargrove stated that there was nothing wrong with such view, and stated that he needed time to digest this information, and scheduled another call with Mr. Cherner for Monday, March 15, 2021.  Mr. Cherner stated that he wanted to make sure that the

call would be one-on-one, and defendant Hargrove confirmed that the call would be one-on-one and confirmed that the call would take place.

91.    On Sunday, March 14, 2021, defendant Hargrove sent Mr. Cherner an email, stating that "something had come up" that would take 100% of his time through Wednesday, March 17, 2021, and that he would look at his schedule so that he and Mr. Cherner could talk later in the week.

92.    Defendant Hargrove acted in bad faith and with bad intent, as he never reached out to Mr. Cherner in this regard.

93.    In other words, instead of putting a stop to the bad and illegal behavior in which defendants Mitchell and Kane were engaging, defendant Hargrove decided to participate in such behavior, by turning a blind eye to it and refusing to stop it.

94.    On March 15, 2021, defendant Mitchell sent Mr. Cherner an email stating that he wanted to talk to him.

95.    Mr. Cherner and defendant Mitchell spoke later in the day on March 15, 2021.

96.    Shockingly, defendant Mitchell told Mr. Cherner that he was "personally insulted" and insulted for defendant Kane that he, Mr. Cherner, was calling department heads, and that he, Mr. Cherner, was spending all his time and energy calling department heads and others and calling defendant Hargrove at night.

97.    Defendant Mitchell told Mr. Cherner that he needed to focus on basics, and that there were so many basic skills that he needed to learn and that he needed to spend his time on those basic skills, and that, going forward, he, defendant Mitchell, was going to make Mr. Cherner spend time learning basic skills.

98.     Such behavior by defendant Mitchell was a clear attempt to continue and step up his and defendant Kane's intentional, malicious, and deliberate harassment and intimidation of Mr. Cherner and an attempt to discredit him.  Defendant Mitchell knew that his statements were false and harassing, and that they lacked credulity.

99.     In response, Mr. Cherner explained to defendant Mitchell that he had spoken to 5 people for about 30-40 minutes each, and certainly had not and was not spending "all of his time and energy" on such calls, and that in fact there was very little time and energy spent in this regard.

100.    Mr. Cherner also told defendant Mitchell that he had no idea to what he was referring regarding calling defendant Hargrove at night.  Defendant Mitchell never explained himself with respect to this patently false lie.

101.    Mr. Cherner also made it clear to defendant Mitchell that the statements made in his March 5, 2021, were untrue, and that there were no prior opportunities to speak to department heads and develop working relationships with others in ProBank in this regard.

102.    Mr. Cherner reminded defendant Mitchell that the one individual that defendant Mitchell had suggested talking to and working with (not a department head), that Mr. Cherner had reached out to such individual, and that such individual had not gotten back to Mr. Cherner, and that defendant Mitchell was aware of these facts.  Defendant Mitchell acknowledged that this was the case.

103.    Mr. Cherner asked defendant Mitchell, did he think he, Mr. Cherner, should have declined defendant Hargrove's directive that he attend the management meeting ?

104.    Defendant Mitchell stated that this was defendant Hargrove's decision, but then said that he, Mr. Cherner, should not have been calling department heads and others, and that he,

Mr. Cherner, needed to concentrate on basics, and that he, defendant Mitchell, was going to make sure that he, Mr. Cherner, did so, and that he, Mr. Cherner, had no choice in the matter.

105.    Mr. Cherner told defendant Mitchell that he contacted department heads at the behest of defendant Hargrove, and that he, defendant Mitchell, was aware of that fact.  Mr. Cherner told defendant Mitchell that he was well aware that he, Mr. Cherner, was well versed in the "basics" and that the wide array of work that he, Mr. Cherner, had done and accomplishments he had achieved in the past few years were proof of his knowledge and skills in many areas.

106.    Mr. Cherner also reminded defendant Mitchell that such work had been of good if not great quality, had been met with satisfaction by clients and regulators, and, in many instances, had exceeded expectations.

107.    Defendant Mitchell stated that he did not agree that Mr. Cherner knew the "basics", and told him that his focus needed to be on learning basic skills, and not spending his time speaking to and collaborating with department heads.  He stated again that he was going to make Mr. Cherner focus on the basics and that the choice was not his to make.

108.    During this entire time, defendant Mitchell never explained what he meant by the term "the basics."  Mr. Cherner asked defendant Mitchell what he meant by the "basics" and defendant Mitchell was unable to respond.

109.    Indeed, it is actually defendant Mitchell's competence that was and is suspect. Whenever Mr. Cherner queried him on substantive knowledge, defendant Mitchell was unable to respond.  Whenever Mr. Cherner explained substantive requirements or substantive processes, defendant Mitchell was unable to respond, showing his lack of competence and incompetence in this regard.

110.    In other words, defendant Mitchell continued to do everything he could to violate Mr. Cherner's legal rights and to discriminate and harass and intimidate Mr. Cherner because of his own discriminatory animus and greed, fragile ego, and deceitful and dishonest intent.

111.    Defendant Mitchell appears to have spent and to spend every waking moment of his existence, constantly scheming to lie to others, attempt to manipulate them, overbill clients, have people do the work and pay them as little as possible so as to enrich himself and others, and to cover up any and all deficiencies in said work, and act illegally with respect to employees and customers.

112.    Indeed, defendant Mitchell's lawlessness and lack of respect for others, and overwhelming greed, were and are astonishing and unacceptable.

113.    Such greed and lawlessness drove defendant Mitchell to lie to the CRO and overbill that bank, and then to overbid proposals by the millions, thinking, since he got away with it once, he could get away with it again.  Such greed and dishonesty are what drove defendant Mitchell to attend conferences with an entourage and throw away hundreds of thousands if not millions of dollars on such attendances with little or nothing to show for it.

114.    Such greed and lawlessness drove Mitchell to violate Mr. Cherner's legal rights with impunity, to speak to him unacceptably, and to engage in deliberate, intentional, and malicious campaigns of harassment and intimidation of Mr. Cherner.  In other words, defendant Mitchell did everything he could to undermine Mr. Cherner in his employment and prevent him from being successful.  When defendant Hargrove took action to have Mr. Cherner speak to and potentially develop working relationships with other department heads, defendant Mitchell increased the harassment and intimidation with the clear intent to remove Mr. Cherner from his

employment with defendant ProBank at all costs, and to fabricate lies and to discriminate against Mr. Cherner, and violate his legal rights in so doing.

115.    As a result of such wrongful and discriminatory acts, and defendant Hargrove's refusal to address them, and his cancellation of the appointment with Mr. Cherner that he set for March 15, 2021, and his failure to get back to Mr. Cherner to reschedule such appointment as promised, Mr. Cherner filed a charge of discrimination with the New York State Division of Human Rights (SDHR) (which was also cross filed with the EEOC) on March 22, 2021.

116.    After the events of early March 2021, described above, defendant Kane started reach out to Mr. Cherner's existing customers and replaced Mr. Cherner's name on two proposals, in a clear attempt to replace Mr. Cherner on those customer accounts.

117.    Defendant Kane also had another ProBank employee call Mr. Cherner and ask if he had any hours to submit, and then defendant Kane deceitfully and untruthfully mischaracterized Mr. Cherner's conversation with this employee.

118.    Defendants Mitchell and Kane took steps to strip Mr. Cherner away from his regular customers, so that they could reduce his billable hours and then terminate his employment.

119.    Meanwhile, defendant Mitchell wasted hundreds of thousands of dollars, if not millions of dollars, going to conferences with huge ProBank entourages to stroke his weak and inflated ego, with no results to show for such attendance.  His spending was so extreme that it engendered a retrenchment, whereby costs were cut and about 4 longtime administrative staff were let go – long time, loyal employees, who depended on their employment for their livelihoods.

120.     Defendant Hargrove's and Mitchell's unethical natures also showed themselves when the individual who ran the Audit Department at defendant ProBank retired.  These defendants decided that defendant Mitchell would run the Audit Department, even though defendant Mitchell already ran the Compliance Consulting Department, constituting a conflict of interest.

121.     In order to ensure integrity in ProBank's engagements and work product, it was essential that the individual running the Audit Department not also be running the Compliance Consulting Department.  Defendants Hargrove and Mitchell knew that this arrangement was a conflict of interest, but, apparently, lacked the honesty and integrity needed to care and not engage in such conflict of interest.

122.     After the events of March 2021, defendant Mitchell's and Kane's harassment and intimidation of Mr. Cherner continued and escalated, as these defendants showed that they were going to continue to engage in deliberate, intentional, and malicious harassment of Mr. Cherner and also retaliate against him for filing a charge of discrimination.

123.     By way of background, there were regular complaints about defendant Kane's rudeness, constant swearing, and disrespectful demeanor.

124.     By way of background, defendant Kane, since selling FRC's accounts to ProBank, periodically complained about ProBank's financial condition and defendant Hargrove to Mr. Cherner, and would say to Mr. Cherner, on more or less a regular basis, in effect, that defendant Hargrove "is a fucking idiot, he doesn't know anything about compliance."

125.     By way of background, due to out of control costs, defendant Hargrove, in or around 2019, supposedly took away budgets to attend conferences and networking events.

Defendant Kane told Mr. Cherner that, as a result, approval to attend conferences had to come from defendant Hargrove.

126.    Around the latter part of 2019, Mr. Cherner was told by defendant Kane that defendant Hargrove had not approved him attending a conference he wanted to attend.

127.    Defendant Kane lied to Mr. Cherner, as defendant Hargrove subsequently told Mr. Cherner that he had never denied anyone to attend any conference.

128.    By way of background, Mr. Cherner successfully obtained an engagement in November 2020, based on a lead given to him by defendant Kane.  The content of the proposal and the pricing were communicated to defendant Kane by Mr. Cherner.

129.    After the customer signed the contract, defendant Kane acted like he knew nothing about the engagement or that it had come in, and that Mr. Cherner had worked on getting this engagement without his knowledge.  Such was not true.

130.    Subsequent to Mr. Cherner's obtaining this engagement, of which defendant Kane was aware, he called Mr. Cherner and said, in essence:  "I'm going to fucking say something to you, and don't you say a fucking word.  I know how to get fucking business without your help, I'm capable of getting business on my fucking own and I don't fucking need your fucking help to get business.  Don't you dare think that I fucking need you to fucking get business, because I don't, you arrogant, fucking piece of shit.  Fuck yourself."  Defendant Kane then terminated the call.

131.    In other words, the individual defendants made ProBank a cesspool of deceit, lies, manipulation, and discrimination, and did so in the furtherance of their own greed, egos, insecurities, and mental illnesses.  They did so in violation of legal rights, including contractual rights and well-established statutory law, and also lied to clients in furtherance of their greed.

132.    Subsequent to the events of March 2021, the defendants continued their discriminatory animus and retaliation against, and campaign of harassment and intimidation of, Mr. Cherner by deciding that ProBank would no longer conduct independent validations of BSA monitoring systems using a full data set, but, rather, would only conduct such validations by taking data samples.

133.    In fact, defendants Mitchell and Kane insisted on having a call with Mr. Cherner in which they falsely claimed that such data sampling met regulatory requirements.  During that call, Mr. Cherner made it clear that such data sampling was not sufficient and did not meet regulatory requirements, and made it clear that defendants knew that this was the case.

134.    Despite such awareness, defendants Mitchell and Kane announced at the end of this call that ProBank would no longer conduct validations of BSA monitoring systems using full data sets.

135.    By way of background, Mr. Cherner worked closely with Jamell Creque, owner of Skyline Security, Inc., on validations of BSA monitoring systems, with such engagements being contracted with ProBank.

136.    Mr. Creque had also been instrumental on BSA "look back" work done for a customer under contract with ProBank.

137.    Defendants Mitchell and Kane were aware of Mr. Creque's work and his ability to assist in conducting validations of BSA monitoring systems using full data sets, and were well aware that ProBank did not have this capability internally.

138.    Despite this knowledge, and the knowledge that Mr. Cherner and Mr. Creque had worked together and were working together on several engagements in which SSI/Mr. Creque's abilities were essential to conducting and completing the engagements on a robust and

comprehensive level as expected by the clients, defendants contacted Mr. Creque on May 21,

2021, and, in a continued effort to discriminate against Mr. Cherner and prevent him from having

any work, terminated ProBank's relationship with Mr. Creque and Skyline Security, Inc.

139.    Despite this occurrence, and despite the fact that defendants Mitchell and Kane

had decided that ProBank would no longer conduct validations of BSA monitoring systems using

full data sets, the individual defendants subsequently sent out at least one proposal (and perhaps

more) for a validation of a BSA monitoring system, in which they falsely represented to the

client, and told the client, that the validation would be conducted using a full data set.

140.    On May 25, 2021, defendant Kane went onsite to the bank with respect to which

Mr. Cherner has run the entire audit engagement and the entire relationship for over 1 ½ years.

141.    Defendant Kane went and met with bank personnel for the purpose of displacing

Mr. Cherner from running this relationship, based on defendant Kane's belief that Mr. Cherner

cannot do his job because of his age.

142.    Defendant Kane told individuals at this bank that others would be getting

involved in the work to be done.

143.    Defendant Kane scheduled this meeting with bank management without Mr.

Cherner's knowledge and with no communication to Mr. Cherner, a further indication of

defendant Kane's utter and complete disrespect of Mr. Cherner and belief that Mr. Cherner

cannot do his job because of  his age.

144.    Subsequent to the events of March 2021, Mr. Cherner spoke to Adam Davis, the

supposed CFO of ProBank; Mr. Davis processed payroll for ProBank.  Mr. Cherner asked Mr.

Davis about payment for hours worked over the supposed cap of 180 hours for a 4 week billing

period and 220 hours for a 5 week billing period.

145.    Mr. Cherner told Mr. Davis that, to his understanding, there was no such cap that existed and that he, Mr. Cherner, was being singled out in this regard.

146.    Mr. Davis responded by stating that this cap has been in place for years at ProBank, and that it applies to everyone.

147.    In other words, based on Mr. Davis' representation to Mr. Cherner, defendants, and defendant Hargrove in particular, fraudulently misrepresented to Mr. Cherner that he could and would receive a bonus if he worked over 2400 hours per year and fraudulently induced Mr. Cherner to sign a written employment agreement containing that representation.

148.    Based on Mr. Davis' representation, Mr. Cherner would never be able to receive a bonus, since 45 hours per week for 50 weeks comes out to 2250 hours, less than the 2400 needed to receive a bonus.  Even without vacation, 45 hours per week for a full 52 weeks comes out to 2340 hours, still less than the 2400 needed to receive a bonus.

149.    Defendants went so far as to ostensibly send Mr. Cherner a memorandum dated May 14, 2021, wherein they claimed that Mr. Cherner's billable hours for April, 2021, exceeded the cap by 110 hours and that this was considered "a willful violation."

150.    Defendants also claimed that "we will be conducting an investigation of your billing practices immediately . . . any violation of your maximum billing hour cap and directive in the future will be reason for immediate termination for cause."

151.    In other words, in response to Mr. Cherner's charge of discrimination, defendants doubled down on their discriminatory animus and retaliation, and doubled down on their breach of ProBank's contract with Mr. Cherner, and further threatened him with adverse employment action.

152.    In other words, defendants and, particularly, defendant Hargrove, negotiated a contract with Mr. Cherner in bad faith, in which it was represented, in writing, that he would be entitled to a bonus if he worked over 2400 hours per year; then, less than 2 years later, defendants threatened Mr. Cherner with adverse employment action if he worked hours in excess of a cap which was deliberately set to prevent him from working over 2400 hours per year and receiving a bonus.

153.    In response to Mr. Cherner's charge of discrimination, each of the individual defendants submitted sworn declarations, in August 2021, in which each of them repeatedly perjured themselves.

154.    Defendant Hargrove stated in his declaration:

In February 2021, Mr. Kane asked me to reach out to Mr. Cherner to give him an "attaboy" for the work that he had been doing.  I did so, and that led to a conversation between Mr. Cherner and me concerning his work for ProBank.  Mr. Cherner told me that it would be helpful to his internal marketing efforts if he could be introduced to some of the more senior people in the company, so I invited him to attend an upcoming management meeting.  I subsequently learned from Marty Mitchell that Mr. Mitchell had previously worked with Mr. Cherner to get to know these individuals (which Mr. Cherner did not follow up on), and Mr. Mitchell expressed concerns to me that there could be a perception of favoritism since no other Senior Consultants had attended these meetings.  Since I had already extended the invitation to Mr. Cherner, I nevertheless had him attend the meeting.

Hargrove decl. at p.1 ¶ 5.

155.    With these false statements, defendant Hargrove extended his lawlessness to willful perjury.

156.    Mr. Cherner was not engaged in any "internal marketing efforts."  Mr. Cherner never asked defendant Hargrove to be introduced to "more senior people"; rather, defendant Hargrove initiated having Mr. Cherner attend the management meeting and then reaching out to individuals unilaterally, without any request or prompting from Mr. Cherner.  For defendant

Hargrove to claim otherwise is an outright lie with regard to which he perjured himself, and he knows this to be the case.

157.    Similarly, the claims regarding "favoritism" are just an excuse to try to hide the defendants' lawlessness and discriminatory and retaliatory animus, and deliberate, malicious, and intentional campaign of harassment and intimidation of Mr. Cherner, as the individual defendants have shown favoritism to particular ProBank employees repeatedly.

158.    Finally, defendant Hargrove falsely claimed that Mr. Cherner's status as a licensed real estate agent violated ProBank's policies; this was a lie as well.

159.    Defendant Mitchell also submitted a sworn declaration in which he committed several counts of perjury.

160.    FIRST:  defendant Mitchell claimed that "in March 2021, Mr. Cherner began reporting to me, following the deaths of Kevin Kane's brother and father."  Yet defendant Kane acted to harm Mr. Cherner under the excuse of imposing an hours cap on members of "his team."

161.    SECOND:  defendant Mitchell falsely claimed that "I am aware of some issues where Mr. Cherner has not complied with ProBank's internal processes and procedures and involving his ability to get along with his co-workers . . . for example, in November 2020, there was a situation where Mr. Cherner unilaterally sent a proposal to a Hawaii-based client without first receiving the requisite approval and without including proper terms."

162.    This claim was and is a lie.  Even though no approval was required, defendant Kane was well aware of the situation and reviewed the proposal, and agreed with Mr. Cherner to send the proposal to the prospective client.  In fact, Mr. Cherner obtained the business and successfully conducted and completed the work for this client.  Defendant Mitchell was aware of this situation.

163.    THIRD:  defendant Mitchell falsely claimed that "there have also been issues with Mr. Cherner's ability to get along with his co-workers.  For example, Mr. Cherner upset some of his colleagues who work in ProBank's Toledo office when Mr. Cherner was asked to assist with a project that the Toledo people had brought in, and Mr. Cherner subsequently froze them out of the work."

164.    This claim was and is an outright lie and defendant Mitchell knows this to be the case.  This work involved a client in western New York with respect to whom Mr. Cherner had obtained significant business, which Mr. Cherner conducted and completed to great success.

165.    This client subsequently encountered additional regulatory issues; the Toledo office had been a separate business, Austin & Associates, which had recently merged with PBS to form "ProBank Austin" or "ProBank."  Austin & Associates had done work for this client several years in the past.

166.    When this client encountered additional regulatory issues, the CEO initially reached out to Austin & Associates and queried about providing assistance, but received a proposal that was insufficient in coverage and indeterminate in price.

167.    The CEO was displeased, and reached out to Mr. Cherner; he told Mr. Cherner that he had been unaware of the merger and unaware of Mr. Cherner's ability to assist in this area, and asked Mr. Cherner for a proposal.

168.    With the FULL knowledge and approval of defendants Mitchell and Kane, a proposal was sent; it was executed and Mr. Cherner conducted the work to completion and to great success.

169.    Defendant Mitchell also knows that Mr. Cherner involved the Toledo office in some of the work that was done, so he knows that his claim that Mr. Cherner "froze them out of the work" is an outright lie and outright perjury.

170.    For defendant Mitchell to claim otherwise in his declaration is an outright lie and blatant perjury, and he knows this to be the case.

171.    FOURTH:  Defendant Mitchell also falsely claimed that "I have also been told by other ProBank employees that they would prefer not to work with Mr. Cherner because of his abrasive style."

172.    Mr. Cherner confronted defendant Mitchell with this statement, and asked him which employees had so stated; defendant Mitchell was unable to name anyone.

173.    FIFTH:  defendant Mitchell falsely claimed that "I was concerned about Mr. Cherner attending the management team meeting for two reasons.  First, Mr. Cherner was one of more than two dozen Senior Consultants at ProBank, and I did not like the perception that ProBank was playing favorites.  Second, I understood from Mr. Hargrove that Mr. Cherner had been invited to attend the meeting because Mr. Cherner told Mr. Hargrove that it would be an opportunity to network internally, but I had previously had several discussions with Mr. Cherner about ways that he could internally network, and Mr. Cherner had not taken advantage of them, and I felt like Mr. Cherner was going around Mr. Kane and me."

174.    The amount of perjury in this statement is overwhelming.  First, defendant Mitchell knew that defendant Hargrove had proactively and unilaterally invited Mr. Cherner to the management meeting, without any request or prompting from Mr. Cherner, and without any request from Mr. Cherner to "network internally."  Second, defendant Mitchell knew that he had never had discussion with Mr. Cherner about ways to internally network.  Third, defendant

Mitchell knew that Mr. Cherner had not failed in attempting to get to know others within ProBank. Fourth, and upon information and belief, there were not more than two dozen senior consultants at ProBank. Fifth, the claim of concerns about "favoritism" is an outright lie; defendant Mitchell has shown favoritism to particular ProBank employees who are incompetent and not qualified for the jobs that they are assigned to do for years. Sixth, defendant Mitchell's claim is a shill, a false claim put forth to cover up his own discriminatory and retaliatory animus and lawlessness, and campaign of harassment and intimidation against Mr. Cherner.

175.    SIXTH:  defendant Mitchell falsely claimed that "after the management meeting that Mr. Cherner attended, I had a conversation with him to express my concerns to him directly. I told Mr. Cherner that I did not appreciate that he had gone around Mr. Kane and me, and I told him that he needs to focus on how to be a good consultant in the ProBank system, by following processes, working well with others, and developing a better knowledge base in some of the areas where does not have as much experience."

176.    Such claims were outright lies.  In point of fact, defendant Mitchell was told again by Mr. Cherner, as he had been told prior to the management meeting, that he, Mr. Cherner, did not request anything of defendant Hargrove, and that Hargrove proactively and unilaterally invited Mr. Cherner to the management meeting.  When Mr. Cherner asked defendant Mitchell about "processes" to which he was referring, defendant Mitchell had no response.  When Mr. Cherner asked defendant Mitchell what "basics" he was referring to in his claim that Mr. Cherner needed to stick to and learn the "basics", and that he, Mitchell, was going to force Mr. Cherner to do so, defendant Mitchell was unable to respond.  When Mr. Cherner asked defendant Mitchell to list any areas in which he thought Mr. Cherner needed to develop knowledge or expertise which he did not already have, defendant Mitchell was unable to respond.

177.    SEVENTH:  defendant Mitchell falsely claimed that "in June 2021, I received information that Mr. Cherner is working as a real estate agent in addition to his work for ProBank.  I called Mr. Cherner to ask him about this, because ProBank's policy is that outside employment must be approved by the CEO (Chris Hargrove).  In response, Mr. Cherner did not deny working as a real estate agent, but instead accused ProBank of "spying" on him, and he provided no further information.  At Mr. Cherner's request, we forwarded a copy of the relevant policy to Mr. Cherner, and since then, I've reminded him on multiple occasions that he needs to get Mr. Hargrove's approval, but to date, I understand that he has not done so."

178.    More perjury by defendant Mitchell.  First, when this matter came up, Mr. Cherner asked defendant Mitchell how it came about that he had obtained this information, as it sure looked like that he, defendant Mitchell, was looking for anything he could find on Mr. Cherner to make false claims about, and in retaliation for Mr. Cherner filing a charge of discrimination, and in furtherance of his discriminatory animus towards Mr. Cherner and his willingness to violate Mr. Cherner's legal rights.  Defendant Mitchell refused to answer Mr. Cherner's questions and disclose who had been searching and the motive for such searching. Second, Mr. Cherner asked defendant Mitchell to explain why being a licensed real estate agent was a violation of ProBank's policy, and defendant Mitchell was unable to respond.  Mr. Cherner asked defendant Mitchell to point to specific language in any ProBank policy which prohibited Mr. Cherner from being a licensed real estate agent or engaging in transactions as a licensed real estate agent, and defendant Mitchell was unable to respond.  Mr. Cherner asked defendant Mitchell to provide him, either at that time or after review, with specific language or clauses in any ProBank policy which contained any such prohibitions.  Defendant Mitchell never responded to Mr. Cherner and never provided any such information.  Third, defendant Mitchell

never told or reminded Mr. Cherner "on multiple occasions" that he, Mr. Cherner, needed

permission from defendant Hargrove in this regard; rather, Mr. Cherner asked defendant Mitchell

to point out language or clauses in any policy that pointed to such prohibition, and defendant

Mitchell was unable to do so and never did so.

179.    Defendant Kane also perjured himself repeatedly in his declaration.

180.    FIRST:  defendant Kane stated "there have been some issues in the areas of Mr.

Cherner complying with ProBank's internal processes and procedures and his ability to get along

with his co-workers.  For example, ProBank's process is that someone at the Managing Director

level of above is required to review and sign proposals for new projects.  For some new client

proposals, I allowed Mr. Cherner to co-sign the proposals as long as I had first reviewed and

approved the proposal."

181.    These claims are lies:  Mr. Cherner specifically had asked defendant Kane if there

were any policies or procedures regarding who could sign a contract proposal and what review

process existed, if any.  Defendant Kane told Mr. Cherner that there were no such policies or

processes.

182. SECOND:  Defendant Kane falsely claimed, "Despite my direction that I was to

review and approve all proposals co-signed by Mr. Cherner, on at least four occasions, Mr.

Cherner sent out proposals without first getting my review and approval.  Some of these

proposals contained errors that I would have identified.  This issue came to a head in November

2020, when Mr. Cherner unilaterally sent a proposal to a Hawaii-based client and later claimed

that I had verbally approved it (which I had not).  After that, I told Mr. Cherner that he was no

longer allowed to co-sign proposals . . . the issue with the Hawaii-based client was particularly

galling to me because I was trying to help Mr. Cherner raise his profile, but Mr. Cherner abused

the authority and trust I had given him, and then lied about it.  I was angry that this had occurred, and I told Mr. Cherner so."

183.    These claims are also lies.  Defendant Kane never gave any such directive; however, it was Mr. Cherner's practice to make sure that defendant Kane had received a copy of the proposal and was aware of the proposed terms and agreed to them; it was not uncommon for Mr. Cherner and defendant Kane to talk about proposed terms, and then agree on them.  There were no occasions where Mr. Cherner sent out contract proposals of which defendant Kane was unaware.  Many times, Mr. Cherner would ask defendant Kane if he had reviewed the proposal that had been discussed and had been forwarded to him; many times, defendant Kane would tell Mr. Cherner to go ahead and send out the proposal.  With respect to the client in Hawaii, Mr. Cherner had discussed this proposal with defendant Kane at length and had received a copy of the proposal before it was sent out; the proposal was sent out with defendant Kane's knowledge and approval.  Finally, defendant Kane is perjuring himself by trying to create an issue with this proposal from November 2020, and then falsely claiming that this was what caused him to tell Mr. Cherner he could no longer sign proposals.  In fact, it was defendant Mitchell's and Kane's discriminatory animus towards Mr. Cherner, and their jealousy, engendered by their fragile egos and their greed, over defendant Hargrove proactively and unilaterally inviting Mr. Cherner, in February 2021, to the March 2021 management meeting, which prompted defendant Kane to tell Mr. Cherner he could no longer sign proposals.

184.    THIRD:  defendant Kane falsely claimed that "another issue with Mr. Cherner involved his billable hours.  On March 5, 2021, I received Mr. Cherner's billable hours for February 2021.  During that four-week period, Mr. Cherner billed 345 hours, which is an average of more than 12 hours a day for every day (including weekends).  Mr. Cherner (or anyone)

working at that rate is a concern to me, because the person working those kinds of hours is more likely to make mistakes or suffer burn-out, especially when you consider the fact that people in Mr. Cherner's role must also spend time on matters that are not billable to the client as part of their job.   Because of these concerns I implemented a hours cap for all members of my team."

185.     The perjury in this statement is overwhelming.  Defendant Kane reviewed Mr. Cherner's hours every month, and was aware that Mr. Cherner was working a lot of hours.  This time was the height of the COVID pandemic, in which Mr. Cherner's travel time to his office was negligible and the need to engage in matters outside of billable hours, such as visiting clients, was minimal.  Because of Mr. Cherner's success at obtaining new business as well as obtaining more business from existing clients, he had a lot of work on matters that needed to get done, and he kept busy.

186.     It was this sustained work over several months in 2020 and extending into 2021, which prompted defendant Kane to repeatedly say to Mr. Cherner that he, Mr. Cherner, was "too old" to work that amount of hours.  In response, Mr. Cherner detailed to defendant Kane, on more than one occasion, his daily routine, his rest, and his diet, which enabled him to work such hours on a sustained basis without any effect on the quality and completion of work.

187.     Defendant Kane's disingenuous claim that his actions were the result of such hours is an outright lie, because he was aware of the volume of such hours months prior to February-March 2021.  Defendant Kane's perjury is an attempt to cover up his discriminatory animus, his retaliation, his lawlessness, and his fragile ego and greed regarding defendant Hargrove's proactive and unilateral action in inviting Mr. Cherner to the March 2021 management meeting.

188.    FOURTH:  defendant Kane falsely claimed that "there have also been issues with Mr. Cherner's ability to get along with his co-workers.  For example, Mr. Cherner upset some of his colleagues who work in ProBank's Toledo office when Mr. Cherner was asked to assist with a project that the Toledo people had brought in, and Mr. Cherner subsequently froze them out of the work .  When I talked to Mr. Cherner about their concerns, Mr. Cherner was dismissive."

189.    These claims by defendant Kane constitute blatant perjury, and he knows this to be the case.  Defendant Kane is referring to the situation referred to in ¶¶ 163-170 above.

190.    When the CEO of the institution approached Mr. Cherner and told him of the issues with the proposal received by the Toledo office, and asked Mr. Cherner for a proposal, Mr. Cherner reached out to defendant Kane for guidance on how to handle this situation.

191.    Defendant Kane informed defendant Mitchell, and with approval from defendant Mitchell, defendant Kane told Mr. Cherner to go ahead and send a new proposal, which was provided to and discussed with defendant Kane before it went out.

192.    Mr. Cherner obtained this business, and conducted and completed the work with great success.  Although Mr. Cherner was under no obligation to do so, Mr. Cherner had some individuals from the Toledo office perform some work under this contract.

193.    All of this was done with the agreement and approval of both defendants Kane and Mitchell.  For them to now claim otherwise is an attempt to hide their wrongful acts against Mr. Cherner, to cover up their wrongdoing, and to impugn Mr. Cherner's reputation, constitutes blatant and intentional perjury and shows their utter lawlessness and criminality.

194.    FIFTH:  defendant Kane claimed that "in February 2021, I asked Chris Hargrove, ProBank's Chairman and CEO, to reach out to Mr. Cherner to give him an "attaboy."  I thought that Hargrove's doing so might help Mr. Cherner with his profile within the company and

perhaps inspire Mr. Cherner to be a better team player.  Shortly after that, I learned that Mr.

Cherner had been invited to attend an upcoming management team meeting in March.  In my

experience, Mr. Cherner is the only Senior Consultant who has been invited to attend a ProBank

management team meeting."

195.    More outright perjury from defendant Kane.  Mr. Cherner did not need guidance

or inspiration to "be a better team player"; Mr. Cherner already was and is a team player.  In fact,

it is defendants who utterly failed to be team players, as witnessed by their discriminatory and

retaliatory animus towards Mr. Cherner; their attempts to cover up their wrongdoing, including a

willingness to commit multiple counts of perjury; defendants Mitchell's and Kane's fragile egos

and greed, which prompted their utterly unacceptable behavior in harming Mr. Cherner in his

employment based on the simple act of defendant Hargrove proactively and unilaterally inviting

Mr. Cherner to the March management meeting, and their failure to support Mr. Cherner, but,

instead, their repeated and continuous attempts to cause him harm and their willingness to

commit multiple perjuries in such attempts; defendant Mitchell's willingness to lie to a client and

commit fraud, defendant Mitchell's wasteful spending, and so on.

196.    There was no need to help Mr. Cherner "with his profile within the company", as

Mr. Cherner was already known to be a hard worker with a strong work ethic who knew how to

get business and knew how to get the job done.  Defendant Kane, in particular, was aware in this

regard.

197.    In or around October 2021, ProBank took adverse employment action against Mr.

Cherner, based on discriminatory animus and in retaliation for Mr. Cherner having filed a charge

of discrimination.

## AS AND FOR A FIRST CAUSE OF ACTION
### Age Discrimination in Employment Act:  29 U.S.C. § 621 et seq. (as against defendants Forvis LLP and ProBank)

198.    Plaintiff repeats and realleges paragraphs 1 through 197 above as though set forth herein.

199.    At all times herein, Mr. Cherner was over 40 years of age.

200.    Mr. Cherner was told repeatedly that he was too old to work the hours that he was working.

201.    Defendants clearly believed that Mr. Cherner could not do his job because of his age, and defendants took adverse employment action against him as a result.

202.    Defendants violated the Age Discrimination in Employment Act (ADEA) in this regard.

203.    Plaintiff is entitled to damages pursuant to 29 U.S.C. § 621 et seq.

## AS AND FOR A SECOND CAUSE OF ACTION
### Age Discrimination in Employment Act:  29 U.S.C. § 621 et seq. (workplace harassment) (as against defendants Forvis LLP and ProBank)

204.    Plaintiff repeats and realleges paragraphs 1 through 203 above as though set forth herein.

205.    At all times herein, Mr. Cherner was over 40 years of age.

206.    Mr. Cherner was told repeatedly that he was too old to work the hours that he was working.

207.    Defendants engaged in an illegal and intentional, malicious, and deliberate campaign to harass and intimidate Mr. Cherner in the workplace, based on their belief that he could not do his job because of his age.

37

208.    Defendants engaged in an illegal and intentional, malicious, and deliberate campaign to harass and intimidate Mr. Cherner in the workplace, in retaliation for Mr. Cherner having filed a charge of discrimination.

209.    Defendants engaged in unlawful workplace harassment against Mr. Cherner based on age, in violation of the Age Discrimination in Employment Act (ADEA) in this regard.

210.    Plaintiff is entitled to damages pursuant to 29 U.S.C. § 621 et seq.

### AS AND FOR A THIRD CAUSE OF ACTION
### Title VII of the Civil Rights Act of 1964; Age Discrimination in Employment Act:  29 U.S.C. § 621 et seq. (retaliation) (as against defendants Forvis LLP and ProBank)

211.    Plaintiff repeats and realleges paragraphs 1 through 210 above as though set forth herein.

212.    In March, 2021, Mr. Cherner filed a charge of discrimination alleging violations of Title VII, the ADEA, and New York and Kentucky law, with the New York State Division of Human Rights and the Equal Employment Opportunity Commission.

213.    Defendants retaliated against Mr. Cherner by engaging in a deliberate, malicious, and intentional campaign to harass and intimidate Mr. Cherner, and to engage in workplace harassment of Mr. Cherner, and to ultimately engage in wrongful discharge and wrongful retaliation against Mr. Cherner.

214.    Defendants illegally retaliated against Mr. Cherner and are liable to him for retaliation.

215.    Mr. Cherner suffered damages as a result of such retaliation, including but not limited to, lost wages, lost business opportunities, physical pain and suffering, and emotional distress, and is entitled to damages.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**New York State Executive (Human Rights) Law § 296:  Age (as against all defendants)**

216.    Plaintiff repeats and realleges paragraphs 1 through 215 above as though set forth herein.

217.    At all times herein, Mr. Cherner was over 40 years of age.

218.    Mr. Cherner was told repeatedly that he was too old to work the hours that he was working.

219.    Defendants clearly believed that Mr. Cherner could not do his job because of his age, and defendants took adverse employment action against him as a result.

220.    Defendants violated New York State's Executive Law § 296 on the basis of age.

221.    Plaintiff suffered damages and is entitled to damages pursuant to New York State's Executive Law § 296.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**New York State Executive (Human Rights) Law § 296:  Age (Workplace Harassment) (as against all defendants)**

222.    Plaintiff repeats and realleges paragraphs 1 through 221 above as though set forth herein.

223.    At all times herein, Mr. Cherner was over 40 years of age.

224.    Mr. Cherner was told repeatedly that he was too old to work the hours that he was working.

225.    Defendants engaged in an illegal and intentional, malicious, and deliberate campaign to harass and intimidate Mr. Cherner in the workplace, based on their belief that he could not do his job because of his age.

226.    Defendants engaged in an illegal and intentional, malicious, and deliberate campaign to harass and intimidate Mr. Cherner in the workplace, in retaliation for Mr. Cherner having filed a charge of discrimination.

227.    Defendants engaged in unlawful workplace harassment against Mr. Cherner based on age, in violation of New York State Executive Law § 296.

228.    Plaintiff suffered damages and is entitled to damages pursuant to New York State Executive Law § 296.

## AS AND FOR A SIXTH CAUSE OF ACTION
### New York State Executive (Human Rights) Law § 296:  Age (retaliation) (as against all defendants)

229.    Plaintiff repeats and realleges paragraphs 1 through 228 above as though set forth herein.

230.    In March, 2021, Mr. Cherner filed a charge of discrimination alleging violations of Title VII, the ADEA, and New York and Kentucky Law, with the New York State Division of Human Rights and the Equal Employment Opportunity Commission.

231.    Defendants retaliated against Mr. Cherner by engaging in a deliberate, malicious, and intentional campaign to harass and intimidate Mr. Cherner, and to engage in workplace harassment of Mr. Cherner, and to ultimately engage in wrongful discharge and wrongful retaliation against Mr. Cherner.

232.    Defendants illegally retaliated against Mr. Cherner and are liable to him for retaliation.

233.    Mr. Cherner suffered damages as a result of such retaliation, including but not limited to, lost wages, lost business opportunities, physical pain and suffering, and emotional distress, and is entitled to damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Kentucky Revised Statutes § 344.040: Age (as against all defendants)

234.    Plaintiff repeats and realleges paragraphs 1 through 233 above as though set forth herein.

235.    At all times herein, Mr. Cherner was over 40 years of age.

236.    Mr. Cherner was told repeatedly that he was too old to work the hours that he was working.

237.    Defendants clearly believed that Mr. Cherner could not do his job because of his age, and defendants took adverse employment action against him as a result.

238.    Defendants violated Kentucky Revised Statutes § 344.040 on the basis of age.

239.    Plaintiff suffered damages and is entitled to damages pursuant to Kentucky Revised Statutes § 344.040.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Kentucky Revised Statutes § 344.040: Age (Workplace Harassment) (as against all defendants)

240.    Plaintiff repeats and realleges paragraphs 1 through 239 above as though set forth herein.

241.    At all times herein, Mr. Cherner was over 40 years of age.

242.    Mr. Cherner was told repeatedly that he was too old to work the hours that he was working.

243.    Defendants engaged in an illegal and intentional, malicious, and deliberate campaign to harass and intimidate Mr. Cherner in the workplace, based on their belief that he could not do his job because of his age.

244.     Defendants engaged in an illegal and intentional, malicious, and deliberate campaign to harass and intimidate Mr. Cherner in the workplace, in retaliation for Mr. Cherner having filed a charge of discrimination.

245.     Defendants engaged in unlawful workplace harassment against Mr. Cherner based on age, in violation of Kentucky Revised Statutes § 344.040.

246.     Plaintiff suffered damages and is entitled to damages pursuant to Kentucky Revised Statutes § 344.040.

**AS AND FOR A NINTH CAUSE OF ACTION**
**Kentucky Revised Statutes § 344.040:  Age (retaliation) (as against all defendants)**

247.     Plaintiff repeats and realleges paragraphs 1 through 246 above as though set forth herein.

248.     In March, 2021, Mr. Cherner filed a charge of discrimination alleging violations of Title VII, the ADEA, and New York and Kentucky Law, with the New York State Division of Human Rights and the Equal Employment Opportunity Commission.

249.     Defendants retaliated against Mr. Cherner by engaging in a deliberate, malicious, and intentional campaign to harass and intimidate Mr. Cherner, and to engage in workplace harassment of Mr. Cherner, and to ultimately engage in wrongful discharge and wrongful retaliation against Mr. Cherner, all in retaliation for Mr. Cherner filing a charge of discrimination, which was a protected activity.

250.     Defendants illegally retaliated against Mr. Cherner and are liable to him for retaliation.

251.     Mr. Cherner suffered damages as a result of such retaliation, including but not limited to, lost wages, lost business opportunities, physical pain and suffering, and emotional distress, and is entitled to damages.

## AS AND FOR A TENTH CAUSE OF ACTION
### Breach of Contract (New York law) (as against defendants Forvis LLP and ProBank)

252.     Plaintiff repeats and realleges paragraphs 1 through 251 above as though set forth herein.

253.     Defendant ProBank entered into a contract of employment with Mr. Cherner dated June 28, 2019.

254.     That contract, along with the oral promises made by defendant Hargrove, ensured that Mr. Cherner would receive a bonus if he worked over 2400 hours per year.

255.     Mr. Cherner worked over 2400 hours per year for each of the full 2 years of his employment with defendant ProBank.

256.     Mr. Cherner never received a bonus for either year, even though he is entitled to such bonuses.

257.     Defendants breached the contract with Mr. Cherner, and Mr. Cherner is entitled to damages for breach of contract.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### Fraud in the Inducement (New York law) (as against all defendants)

258.     Plaintiff repeats and realleges paragraphs 1 through 257 above as though set forth herein.

259.     Defendants made material misrepresentations of material facts:  defendants represented to Mr. Cherner that he would have access to business development and marketing resources and that he would receive a bonus for every year that he billed over 2400 hours.

260.     Defendants knew that these representations were false, as they never intended to give him access to business development and marketing resources and they never intended to allow him to bill over 2400 hours per year.

261.    Defendants made these representations to Mr. Cherner so as to induce his reliance on them and induce him to accept the position and employment.

262.    Mr. Cherner did rely on such representations (which turned out to be false) in deciding to accept the position.  Mr. Cherner's reliance was reasonable.

263.    Such fraudulent inducement caused Mr. Cherner damages, including, but not limited to:  (i) loss of employment; (ii) loss of income and benefits from employment; (iii) loss of revenue and income; and (iv) loss of business opportunities.

264.    Defendants are liable to Mr. Cherner for fraud in the inducement.

## AS AND FOR A TWELFTH CAUSE OF ACTION
### Fraudulent Misrepresentation (New York law) (as against all defendants)

265.    Plaintiff repeats and realleges paragraphs 1 through 264 above as though set forth herein.

266.    Defendants made material misrepresentations of material facts:  defendants represented to Mr. Cherner that he would have access to business development and marketing resources and that he would receive a bonus for every year that he billed over 2400 hours.

267.    Defendants knew that these representations were false, as they never intended to give him access to business development and marketing resources and they never intended to allow him to bill over 2400 hours per year.

268.    Defendants made these representations to Mr. Cherner with reckless disregard of whether they were going to be true, as defendants had no intention of giving access to business development and marketing resources to Mr. Cherner and no intention of allowing Mr. Cherner to bill more than 2400 hours per year.

269.    Defendants made these representations to Mr. Cherner so as to induce his reliance on them and induce him to accept the position and employment.

44

270.    Mr. Cherner did rely on such representations (which turned out to be false) in deciding to accept the position.  Mr. Cherner's reliance was reasonable.

271.    Such fraudulent misrepresentation caused Mr. Cherner damages, including, but not limited to:  (i) loss of employment; (ii) loss of income and benefits from employment; (iii) loss of revenue and income; and (iv) lost business opportunities.

272.    Defendants are liable to Mr. Cherner for fraudulent misrepresentation.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### Negligent Misrepresentation (New York law) (as against all defendants)

273.    Plaintiff repeats and realleges paragraphs 1 through 272 above as though set forth herein.

274.    Defendants made material misrepresentations of material facts:  defendants represented to Mr. Cherner that he would have access to business development and marketing resources and that he would receive a bonus for every year that he billed over 2400 hours.

275.    Defendants knew that these representations were false, as they never intended to give him access to business development and marketing resources and they never intended to allow him to bill over 2400 hours per year.

276.    Defendants made these representations to Mr. Cherner negligently and failed to exercise due diligence so as to ensure that these representations were honored.  In fact, defendants had no intention of giving access to business development and marketing resources to Mr. Cherner and no intention of allowing Mr. Cherner to bill more than 2400 hours per year.

277.    Defendants made these representations to Mr. Cherner so as to induce his reliance on them and induce him to accept the position and employment.

278.    Mr. Cherner did rely on such representations (which turned out to be false) in deciding to accept the position.  Mr. Cherner's reliance was reasonable.

279.    Such negligent misrepresentation caused Mr. Cherner damages, including, but not limited to:  (i) loss of employment; (ii) loss of income and benefits from employment; (iii) loss of revenue and income; and (iv) lost business opportunities.

280.    Defendants are liable to Mr. Cherner for negligent misrepresentation.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
### Fraud (New York law) (as against all defendants)

281.    Plaintiff repeats and realleges paragraphs 1 through 280 above as though set forth herein.

282.    Defendants made material misrepresentations of material facts:  defendants represented to Mr. Cherner that he would have access to business development and marketing resources and that he would receive a bonus for every year that he billed over 2400 hours.

283.    Defendants knew, at the times the representations were made, that these representations were false, as they never intended to give him access to business development and marketing resources and they never intended to allow him to bill over 2400 hours per year.

284.    Defendants intended to deceive Mr. Cherner with respect to such representations. Such intent to deceived occurred every single day of Mr. Cherner's employment (i.e., from June 28, 2019, to in or around October 2021).

285.    Defendants made these representations to Mr. Cherner so as to induce his reliance on them and induce him to accept the position and employment.

286.    Mr. Cherner did rely on such representations (which turned out to be false) in deciding to accept the position.  Mr. Cherner's reliance was reasonable.

287.    Such fraud caused Mr. Cherner damages, including, but not limited to:  (i) loss of employment; (ii) loss of income and benefits from employment; (iii) loss of revenue and income; and (iv) lost business opportunities.

288.    Defendants are liable to Mr. Cherner for fraud.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
### Breach of Contract (Kentucky law) (as against defendant Forvis and ProBank)

289.    Plaintiff repeats and realleges paragraphs 1 through 288 above as though set forth herein.

290.    Defendant ProBank entered into a contract of employment with Mr. Cherner dated June 28, 2019.

291.    That contract, along with the oral promises made by defendant Hargrove, ensured that Mr. Cherner would receive a bonus if he worked over 2400 hours per year.

292.    Mr. Cherner worked over 2400 hours per year for each of the full 2 years of his employment with defendant ProBank.

293.    Mr. Cherner never received a bonus for either year, even though he is entitled to such bonuses.

294.    Defendants breached the contract with Mr. Cherner, and Mr. Cherner is entitled to damages for breach of contract.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
### Fraud in the Inducement (Kentucky law) (as against all defendants)

295.    Plaintiff repeats and realleges paragraphs 1 through 294 above as though set forth herein.

296.    Defendants made material misrepresentations of material facts:  defendants represented to Mr. Cherner that he would have access to business development and marketing resources and that he would receive a bonus for every year that he billed over 2400 hours.

297.    Defendants knew that these representations were false, as they never intended to give him access to business development and marketing resources and they never intended to allow him to bill over 2400 hours per year.

298.    Defendants made these representations to Mr. Cherner so as to induce his reliance on them and induce him to accept the position and employment.

299.    Mr. Cherner did rely on such representations (which turned out to be false) in deciding to accept the position.  Mr. Cherner's reliance was reasonable.

300.    Such fraudulent inducement caused Mr. Cherner damages, including, but not limited to:  (i) loss of employment; (ii) loss of income and benefits from employment; (iii) loss of revenue and income; and (iv) loss of business opportunities.

301.    Defendants are liable to Mr. Cherner for fraud in the inducement.

### AS AND FOR A SEVENTEENTH CAUSE OF ACTION
### Fraudulent Misrepresentation (Kentucky law) (as against all defendants)

302.    Plaintiff repeats and realleges paragraphs 1 through 301 above as though set forth herein.

303.    Defendants made material misrepresentations of material facts:  defendants represented to Mr. Cherner that he would have access to business development and marketing resources and that he would receive a bonus for every year that he billed over 2400 hours.

304.    Defendants knew that these representations were false, as they never intended to give him access to business development and marketing resources and they never intended to allow him to bill over 2400 hours per year.

305.    Defendants made these representations to Mr. Cherner with reckless disregard of whether they were going to be true, as defendants had no intention of giving access to business

development and marketing resources to Mr. Cherner and no intention of allowing Mr. Cherner to bill more than 2400 hours per year.

306.    Defendants made these representations to Mr. Cherner so as to induce his reliance on them and induce him to accept the position and employment.

307.    Mr. Cherner did rely on such representations (which turned out to be false) in deciding to accept the position.  Mr. Cherner's reliance was reasonable.

308.    Such fraudulent misrepresentation caused Mr. Cherner damages, including, but not limited to:  (i) loss of employment; (ii) loss of income and benefits from employment; (iii) loss of revenue and income; and (iv) lost business opportunities.

309.    Defendants are liable to Mr. Cherner for fraudulent misrepresentation.

## AS AND FOR AN EIGHTEENTH CAUSE OF ACTION
### Negligent Misrepresentation (Kentucky law) (as against all defendants)

310.    Plaintiff repeats and realleges paragraphs 1 through 309 above as though set forth herein.

311.    Defendants made material misrepresentations of material facts:  defendants represented to Mr. Cherner that he would have access to business development and marketing resources and that he would receive a bonus for every year that he billed over 2400 hours.

312.    Defendants knew that these representations were false, as they never intended to give him access to business development and marketing resources and they never intended to allow him to bill over 2400 hours per year.

313.    Defendants made these representations to Mr. Cherner negligently and failed to exercise due diligence so as to ensure that these representations were honored.  In fact, defendants had no intention of giving access to business development and marketing resources to Mr. Cherner and no intention of allowing Mr. Cherner to bill more than 2400 hours per year.

49

314.    Defendants made these representations to Mr. Cherner so as to induce his reliance on them and induce him to accept the position and employment.  Defendants supplied false information for guidance for Mr. Cherner in his business transactions

315.    Mr. Cherner did rely on such representations (which turned out to be false) in deciding to accept the position.  Mr. Cherner's reliance was reasonable and justifiable.

316.    Such negligent misrepresentation caused Mr. Cherner damages, including, but not limited to:  (i) loss of employment; (ii) loss of income and benefits from employment; (iii) loss of revenue and income; and (iv) lost business opportunities.

317.    Defendants are liable to Mr. Cherner for negligent misrepresentation.

## AS AND FOR A NINETEENTH CAUSE OF ACTION
### Fraud (Kentucky law) (as against all defendants)

318.    Plaintiff repeats and realleges paragraphs 1 through 317 above as though set forth herein.

319.    Defendants made material misrepresentations of material facts:  defendants represented to Mr. Cherner that he would have access to business development and marketing resources and that he would receive a bonus for every year that he billed over 2400 hours.

320.    Defendants knew, at the times the representations were made, that these representations were false, as they never intended to give him access to business development and marketing resources and they never intended to allow him to bill over 2400 hours per year.

321.    Defendants intended to deceive Mr. Cherner with respect to such representations. Such intent to deceived occurred every single day of Mr. Cherner's employment (i.e., from June 28, 2019, to in or around October 2021).

322.    Defendants made these representations to Mr. Cherner so as to induce his reliance on them and induce him to accept the position and employment.

323.    Mr. Cherner did rely on such representations (which turned out to be false) in deciding to accept the position.  Mr. Cherner's reliance was reasonable.

324.    Such fraud caused Mr. Cherner damages, including, but not limited to:  (i) loss of employment; (ii) loss of income and benefits from employment; (iii) loss of revenue and income; and (iv) lost business opportunities.

325.    Defendants are liable to Mr. Cherner for fraud.

### AS AND FOR A TWENTIETH CAUSE OF ACTION
### Wrongful Constructive Discharge (Kentucky law) (as against all defendants)

326.    Plaintiff repeats and realleges paragraphs 1 through 325 above as though set forth herein.

327.    Defendants made material misrepresentations of material facts:  defendants represented to Mr. Cherner that he would have access to business development and marketing resources and that he would receive a bonus for every year that he billed over 2400 hours.

328.    Defendants knew, at the times the representations were made, that these representations were false, as they never intended to give him access to business development and marketing resources and they never intended to allow him to bill over 2400 hours per year.

329.    Defendants intended to deceive Mr. Cherner with respect to such representations. Such intent to deceived occurred every single day of Mr. Cherner's employment (i.e., from June 28, 2019, to in or around October 2021).

330.    Defendants made these representations to Mr. Cherner so as to induce his reliance on them and induce him to accept the position and employment.

331.    Mr. Cherner did rely on such representations (which turned out to be false) in deciding to accept the position.  Mr. Cherner's reliance was reasonable.

332.    From the beginning of his employment, defendants, and particularly defendant Mitchell, acted to undermine Mr. Cherner's employment, by preventing him from accessing business development and marketing resources, and, ultimately, taking action to prevent him from being able to bill more than 2400 per year.

333.    Defendants' actions were ongoing and so pervasive that their actions created a workplace so permeated with harassment and intimidation that Mr. Cherner's employment came to an end as a result.

334.    Defendants' actions were so intolerable that a reasonable person would have felt compelled to end such employment.

335.    As a result of the end of such employment, Mr. Cherner suffered damages, including but not limited to lost wages, lost benefits, lost business opportunities, emotional distress, and physical stress and pain and suffering due to emotional distress.

336.    Defendants are liable to Mr. Cherner for constructive discharge.

### AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
### Retaliatory Discharge (Kentucky law) (as against defendants Forvis and ProBank)

337.    Plaintiff repeats and realleges paragraphs 1 through 336 above as though set forth herein.

338.    Mr. Cherner filed a charge of discrimination with the NYSDHR and the EEOC in March, 2019.  Such filing constituted a protected activity.

339.    As a result of filing such charge, defendants stepped up their intentional, malicious, and deliberate campaign of harassment and intimidation of Mr. Cherner.  Specifically, they took away work from Mr. Cherner, intentionally reduced his hours, and prevented him from developing more business and continued to prevent him from having access to business development and marketing resources.

340.    Defendants also failed and refused to pay him a 2nd bonus to which he was entitled.

341.    Defendants also perjured themselves in sworn declarations submitted in response to Mr. Cherner's charge, in a defamatory attempt to smear Mr. Cherner and impugn his reputation.

342.    Defendants continued to scheme with the intent to retaliate against Mr. Cherner and end his employment, either directly or through wrongful constructive discharge.

343.    Defendants knew that such retaliatory acts were wrongful and illegal, but they took such acts anyway, and stepped up their campaign of harassment and intimidation.

344.    As a result of such wrongful acts, Mr. Cherner's employment ended.

345.    The end of Mr. Cherner's employment constituted wrongful retaliatory discharge. Defendants' behavior and the environment they created was so intolerable that no reasonable person would have continued such employment.

346.    As a result of such wrongful retaliatory discharge, Mr. Cherner suffered damages, including but not limited to From the beginning of his employment, defendants, and particularly defendant Mitchell, acted to undermine Mr. Cherner's employment, by preventing him from accessing business development and marketing resources, and, ultimately, taking action to prevent him from being able to bill more than 2400 per year.

347.    Defendants' actions were ongoing and so pervasive that their actions created a workplace so permeated with harassment and intimidation that Mr. Cherner's employment came to an end as a result.

348.    Defendants' actions were so intolerable that a reasonable person would have felt compelled to end such employment.

349.    As a result of the end of such employment, Mr. Cherner suffered damages, including but not limited to lost wages, lost benefits, lost business opportunities, emotional distress, and physical stress and pain and suffering due to emotional distress.

350.    Defendants are liable to Mr. Cherner for wrongful retaliatory discharge.

## AS AND FOR A TWENTY-SECOND CAUSE OF ACTION
## Negligent Infliction of Emotional Distress (New York law) (as against all defendants)

351.    Plaintiff repeats and realleges paragraphs 1 through 350 above as though set forth herein.

352.    Defendants had duties – by contract and representation – to provide Mr. Cherner access to business development and marketing resources, and to pay Mr. Cherner a bonus if he billed over 2400 hours per year.  Defendants also had duties not to subject Mr. Cherner to discrimination, harassment, or retaliation, and not to act to frustrate Mr. Cherner's attempts to develop business and to bill over 2400 hours per year.

353.    Defendants intentionally breached those duties, had reckless disregard as to their obligations to meet those duties, and were negligent in meeting those duties.

354.    Defendants' intentional, reckless, and negligent breach of those duties were the direct cause of emotional harm, including but not limited to, severe mental pain and anguish and emotional distress, to Mr. Cherner.

356.    Defendants' breaches of duties were so extreme, and caused such severe mental pain and anguish and emotional distress to Mr. Cherner, that it also caused extreme physical stress to Mr. Cherner which caused him to fear for his physical safety.

357.  The realization, over time, that defendants were discriminating against him, were breaching the contract with him, had made false representations to him, and the deliberate and intentional campaign of harassment and intimidation of him, including the attempts and intent to

54

prevent him from having access to business development and marketing resources and to prevent

him from billing over 2400 hours per year, caused Mr. Cherner severe mental pain and anguish

and emotional distress, and severe physical stress and physical harm, and caused him to fear for

his physical safety.

358.    Defendants are liable to Mr. Cherner for negligent infliction of emotional distress.

**AS AND FOR A TWENTY-THIRD CAUSE OF ACTION**
**Negligent Infliction of Emotional Distress (Kentucky law) (as against all defendants)**

359.    Plaintiff repeats and realleges paragraphs 1 through 358 above as though set forth

herein.

360.    Defendants had duties – by contract and representation – to provide Mr. Cherner

access to business development and marketing resources, and to pay Mr. Cherner a bonus if he

billed over 2400 hours per year.  Defendants also had duties not to subject Mr. Cherner to

discrimination, harassment, or retaliation, and not to act to frustrate Mr. Cherner's attempts to

develop business and to bill over 2400 hours per year.

361.    Defendants intentionally breached those duties, had reckless disregard as to their

obligations to meet those duties, and were negligent in meeting those duties.

362.    Defendants' intentional, reckless, and negligent breach of those duties were the

direct cause of emotional harm, including but not limited to, severe mental pain and anguish and

emotional distress, to Mr. Cherner.

363.    Defendants' breaches of duties were so extreme, and caused such severe mental

pain and anguish and emotional distress to Mr. Cherner, that it also caused extreme physical

stress to Mr. Cherner which caused him to fear for his physical safety.

364.  The realization, over time, that defendants were discriminating against him, were

breaching the contract with him, had made false representations to him, and the deliberate and

intentional campaign of harassment and intimidation of him, including the attempts and intent to prevent him from having access to business development and marketing resources and to prevent him from billing over 2400 hours per year, caused Mr. Cherner severe mental pain and anguish and emotional distress, and severe physical stress and physical harm, and caused him to fear for his physical safety.

365.    Defendants are liable to Mr. Cherner for negligent infliction of emotional distress.

## PRAYER FOR RELIEF

366.    Plaintiff requests the following relief:

(a) On the First through Twenty-Third causes of action, compensatory damages as permitted by law, to be determined at trial;

(b) On the First through Twenty-Third causes of action, punitive damages as permitted by statute or by common law;

(c) An injunction enjoining defendants from engaging in such violations of law as described herein;

(d) Attorney's fees and costs as to which plaintiff may be entitled;

(e) Such other and further relief as the Court may deem appropriate.

Respectfully submitted,

THE CHERNER FIRM
By: Dan Cherner (DC-1905)
411 Theodore Fremd Ave. Suite 206S
Rye, NY 10580
(917) 310-9800
fedctsdc@gmail.com

Dated: September 3, 2024
        Rye, New York